UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Matthew Zinicola

    v.                                       Case No. 16-cv-542-JL
                                                Opinion No. 2018 DNH 082
Mott MacDonald, LLC, et al.


**MEMORANDUM OPINION**

This removed case stems from a planned natural gas pipeline
project in southern New Hampshire and a verbal confrontation
between pipeline opponent Matthew Zinicola and a project
surveyor.  The confrontation led to Zinicola's local arrest for
felonious criminal threatening.[1]  The criminal prosecution was
terminated approximately seven months later when the court
entered a conditional dismissal.  Zinicola sued the companies
constructing the pipeline, Kinder Morgan Energy Partners, L.P.
and Tennessee Gas Pipeline Co., LLC (collectively "Kinder
Morgan"),[2] the contractor retained to conduct field operations,
Hatch Mott MacDonald ("HMM"), the surveyor, David Shirley, the
arresting officer, Lt. Sean Cavanaugh and his employer, the Town
of New Ipswich, N.H.  He asserts state-law claims of malicious
prosecution, intentional infliction of emotional distress and
violation of the New Hampshire Constitution.  Zinicola also avers

---

[1] See N.H. Rev. Stat. Ann. § 631:4.

[2] These two defendants are subsidiaries of Kinder Morgan, Inc.,
and refer to themselves collectively in their pleadings.  The
court will do the same.

that his arrest and prosecution give rise to liability under 42 U.S.C. § 1983 for violations of his federal constitutional rights under the First and Fourth Amendments and the New Hampshire Constitution.  Jurisdiction is based on 28 U.S.C. § 1331 (federal question); see also 28 U.S.C. § 1441 (removal).

All defendants have moved for summary judgment.  Fed. R. Civ. P. 56.  With respect to plaintiff's malicious prosecution claim,[3] the private defendants argue that the undisputed material facts prove that there was probable cause for his arrest, that the criminal proceedings did not terminate in Zinicola's favor, and that they did not act with the requisite malice.  Lt. Cavanaugh argues that the existence of probable cause is fatal to the constitutional claims asserted against him.  The defendants also argue that the undisputed facts establish no conduct sufficient to support a claim for intentional infliction of emotional distress.  After reviewing the parties' written submissions and conducting oral argument, the courts finds that

---

[3] In Count 1, Zinicola asserts a state-law malicious prosecution claim against Shirley, HMM and Kinder Morgan.  In Count 4, Zinicola invokes 42 U.S.C. § 1983 and alleges that Lt. Cavanaugh, acting under color of state law, is also responsible for his unlawful, in violation of his constitutional rights. Plaintiff withdrew a defamation claim following oral argument on Kinder Morgan's motion to dismiss, which the court denied from the bench.  See Endorsed Order, May 17, 2017.  Plaintiff also withdrew Fifth and 14th Amendment claims against Lt. Cavanaugh and constitutional claims against the Town of New Ipswich at oral argument on the instant motion.

there are no genuine issues of material fact and the defendants are entitled to summary judgment on all counts.[4]

## I.  Applicable legal standard

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court "constru[es] the record in the light most favorable to the nonmoving party and resolv[es] all reasonable inferences in that party's favor."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).  In the summary judgment analysis, "a fact is 'material' if it has the potential of determining the outcome of the litigation."  Maymi v. P.R. Ports. Auth., 515 F.3d 20, 25 (1st Cir. 2008).  A factual dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (citation and internal quotation marks omitted).  Nevertheless, if the nonmoving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)

---

[4] Lt. Cavanaugh also argues that he is entitled to qualified immunity.  In light of the court's findings herein, it does not reach that defense.

(citations omitted).  With these guideposts in mind, the court
turns next to the facts of record, which are undisputed unless
otherwise noted.

## II.  Background

In 2014, defendants began work on what was known as the
Northeast Energy Direct project, a natural gas pipeline with
related infrastructure that was to be constructed along New
Hampshire's southern border.  Kinder Morgan contracted with HMM
to conduct field operations that included survey work.  The
project met with local resistance.[5]

At the time of the incident that gives rise to this lawsuit,
Shirley was employed by HMM as a surveyor.[6]  He was part of a
three-man crew surveying land in New Ipswich.  The property where
Shirley and his crew were working was under consideration as a
potential site for a compressor station.[7]

On September 8, 2015, Shirley and two surveying colleagues
were working near power lines just west of Route 45 in New
Ipswich.[8]  They had arrived there in two vehicles, each of which

---

[5] Complaint, doc. no. 1-1, at ¶¶ 13-15.

[6] Shirley Dep., doc. no. 39-3, at 32.

[7] Id. at 10-14.

[8] Id.

4

was parked under the power lines to the west of Route 45.[9] Haggerton and Hogg's vehicle was closer to Route 45 than Shirley's, which was parked further along the access road along the power lines.[10] At around 1:30 p.m., the men returned to their vehicles to leave the area.[11]

Around this time, the Plaintiff was heading north on Route 45. As he reached the power lines, the Plaintiff saw the Haggerton/Hogg car.[12] Believing that people associated with the vehicle were trespassing, Zinicola pulled over on the east side of Route 45, got out of his car and crossed the road to take pictures of the surveyors' car. One of the other surveyors saw Zinicola and told Shirley. The two other surveyors then drove away from the scene.[13] Shirley got in his own car and started to drive down the access road, turning right when he reached Route 45.[14]

At this point the stories diverge. According to Shirley, he slowed along Route 45 to take a picture of Zinicola's license

---

[9] Route 45 cuts through the northeast corner of New Ipswich, running roughly north-south. The power lines cross Route 45 at a perpendicular. Affidavit of Chief Timothy Carpenter, doc. no 37-4, ¶4.

[10] Shirley Dep., doc. no. 39-3, at 32.

[11] Id. at 18.

[12] Zinicola Dep., doc. no. 37-3, at 10.

[13] Id. at 14-15.

[14] Shirley Dep., doc. no. 39-3, at 23-24.

plate through a rolled-down window and told Zinicola he was doing so.[15]  Shirley testified in his deposition that Zinicola walked toward Shirley's car and yelled, "Wait, I'm coming back with my AR-15."[16]  Zinicola claims that when he heard Shirley's car approaching Route 45, he retrieved a "no pipeline" sign from the back of his car, intending to display it to Shirley.[17]  He asserts that he essentially told Shirley to stop trespassing on private property.[18]  He also claims that he was holding the when Shirley took the photo, but Shirley denies seeing a sign and Zinicola is not holding one in a photo Shirley took.[19]

Zinicola denies making that particular statement about the gun and claims that Shirley "accelerated [towards him] in an aggressive manner" with his car.[20]  Zinicola initially denied to making any gun-related comment to Shirley, but later stated in his Complaint, interrogatory answers and deposition that he asked Shirley whether he would take Zinicola's sign seriously "'if I were standing here protecting my property with my AR rifle,' or words to that effect."[21]

---

[15] Id. at 23.

[16] Id. at 24.

[17] Zinicola Dep., doc. no. 39-2, at 17-19.

[18] Id., at 25.

[19] Shirley Dep., doc. no. 39-3, at 35; photograph, doc. no 39-9.

[20] Zinicola Dep., doc. no. 39-2, at 28.

[21] Complaint, doc. 1-1, ¶ 24.

Immediately following this encounter, both men drove to the nearby Temple/Greenville Police Department, as they assumed the incident occurred in Greenville.[22] Shirley testified at his deposition that he went to the police station because he felt threatened by Zinicola's "AR" comment.[23] Zinicola intended to report Shirley's surveying crew's alleged trespass.[24] The two men spoke to the Greenville police separately. Shirley told the officer that he had been threatened. The officer asked Shirley if he had seen a gun. Shirley said he had not. The officer told Shirley that he did not consider it a threat because he had not seen a gun.[25] Eventually both men were informed that the incident actually took place in New Ipswich, and would have to be reported there.[26]

Zinicola then went directly to the New Ipswich Police Department, where he spoke with the department's administrative assistant.[27] He reported that he had seen a vehicle at the power lines on Route 45, which he believed might have been connected to

---

[22] Zinicola Dep., doc. no. 39-2, at 28-29, 61; Shirley Dep., doc. no. 39-3, at 63.

[23] Shirley Dep., doc. no. 39-3, at 126.

[24] Zinicola Dep., doc. no. 39-2 at 61-62.

[25] Shirley Dep., doc. no. 39-3, at 69-69, 76.

[26] Id. at 81.

[27] Zinicola Dep., doc. no. 39-2, at 70.

trespassing.[28]  He claims that Lt. Sean Cavanaugh was present
during this conversation with the assistant and interrupted him,
stating that they would not be looking into the matter any
further unless they heard from the property owner.[29]  Zinicola
did not make any mention of any threatening action by Shirley
towards him, recalling that he "didn't even think about that
issue."[30]

Shirley did not go immediately to the New Ipswich police,
instead driving to Springfield, MA to attend to his elderly
mother.[31]  He called the New Ipswich police department, however,
to report what happened, inform them that he would be in
following day, and that his surveying crew would now need a
police detail.[32]  He met with defendant Lt. Cavanaugh at the New

---

[28] Id.

[29] Id.

[30] Id. at 71.

[31] Shirley Dep., doc. no. 39-3, at 82.  Plaintiff suggests that
Shirley's decision not to go directly to New Ipswich is somehow
inconsistent with what Shirley describes as a threat.  See, e.g.,
Pltff. Obj., doc. no. 41-1, at 4-5 ("Then after this event, Mr.
Shirley drove to [Greenville] to report it, but did not drive
three miles away to report it at [NIPD] . . .; instead he drove
to his mother's house in Springfield.").  Plaintiff supports this
assertion with a reference to page 83 of Shirley's deposition,
where Shirley agrees with that chronology.  However, Plaintiff's
implication is undercut by Shirley's reference to his mother "not
doing well" on the preceding page.  Given the full context of
Shirley's deposition testimony, the court draws no negative
inference from Shirley's decision to call the New Ipswich
Department on the day of the incident, and appear there the next
day.

[32] Police report, doc. no. 39-4.

Ipswich police department the next morning.[33]  Shirley told Lt.

Cavanaugh that while surveying at the power lines by Route 45, an

individual was taking pictures of one the employee vehicles.[34]

Shirley said that he took a picture of the person, who then said,

"Wait for me while I go get my AR-15."[35]  Shirley described the

man's tone as 'threatening' and stated that he appeared upset.[36]

Lt. Cavanaugh asked if Shirley himself felt threatened, and

Shirley responded that he did.[37]  Shirley added that it was

serious enough to him that they were now requiring a police

detail at the site.[38]  Shirley showed him the photograph he had

taken, which Lt. Cavanaugh recognized as Zinicola.[39]  Shirley

provided a written statement, in which he stated that Zinicola

told him to "wait for him while he goes and gets his AR-15."  He

---

[33] Shirley Dep., doc. no. 39-3, at 36-37, 45.

[34] Cavanaugh Dep., doc no. 37-9, at 71, 75.

[35] Id. at 80.

[36] Id. at 90.

[37] Id. at 90, 94.

[38] Id. at 92.

[39] Id. at 102; doc. no. 37-10.  Shirley testified that he took
one photograph and was uncertain whether he showed it to Lt.
Cavanaugh.  Shirley Dep. doc. 39-3 at 45.  He also said that he
might have shown it to Lt. Cavanaugh "to show the license plate,"
but was "not positive."  Id. at 46.  Lt.  Cavanaugh testified
that Shirley showed him two pictures - one of Zinicola and one of
the car.  Cavanaugh dep., doc 42-6, at 102.  The photograph
entered into evidence showed both Zinicola and his vehicle. Doc.
no. 37-10.

again described the Plaintiff as 'threatening and upset' to the point that they now wanted a police detail daily.[40]

Approximately one week later, Zinicola, at Lt. Cavanaugh's request, met Lt. Cavanaugh at the police station to discuss the incident.[41]  During this meeting, Zinicola denied making a verbal threat involving a gun, and further denied saying "anything about a gun."[42]  Zinicola claims that during his conversation with Lt. Cavanaugh, the officer told him "they're pushing for a felony because they're pissed about spending extra money on security details."[43]  Lt. Cavanaugh denies saying that to Zinicola.[44]  At some point during their conversation, Lt. Cavanaugh asked Zinicola if he owned an AR-15.  Zinicola admitted that he did.[45]  Lt. Cavanaugh had not told, and did not tell, Zinicola that Shirley reported the threat as involving that particular firearm.

---

[40] Id. at 117; Shirley Stmt., doc. no. 39-11; Shirley Dep., doc. no. 39-3, at 28

[41] Zinicola Dep., doc. no. 39-2, at 177.

[42] Id. at 50, 54, 182.

[43] Id. at 49.

[44] Cavanaugh Dep., doc. no. 39-16, at 133.

[45] Zinicola Dep., doc. no. 39-2, at 49-50.

Like Shirley, Zinicola provided a written report of the
encounter with Shirley.[46] He stated that Shirley drove out onto
Route 45 and began to take photos or video of him.[47] He
continued, "I shouted to him 'We better not find you illegally
trespassing on land you shouldn't be on.'"[48] He added, "At that
point in time, the vehicle veered toward me aggressively and left
at a high rate of speed" and that he (Zinicola) then drove to the
Greenville police station.[49]

Zinicola's written statement lacks any reference to the AR-
15 question he admits posing to Shirley in his Complaint.
Zinicola blames the omission on a lack of recall at the time.[50]
Although he claims that he remembered making the rifle reference
to Shirley two days after meeting with Lt. Cavanaugh, he concedes
that he made no attempt to correct his written statement.[51] Most
recently, Zinicola claims that he "misquot[ed]" himself in his
written statement.[52] He instead asserts that he actually made
two comments to Shirley, first saying, "We better not find you
illegally trespassing on land you shouldn't be on" and, after

---

[46] Zinicola Stmt., doc. no. 37-12.

[47] Id.

[48] Id.

[49] Id.

[50] Zinicola Dep., doc. no. 39-2, at 57-58.

[51] Id. at 46-48, 58, 188-91.

[52] Id. at 46.

Shirley "accelerated towards him," asking Shirley "What would it take for you to take these signs seriously? Would I have to be standing there with my AR-15."[53] The latter two statements are consistent with the allegations in the Complaint.[54]

Lt. Cavanaugh subsequently prepared a Criminal Complaint charging Zinicola with criminal threatening in violation of N.H. Rev. Stat. Ann. § 631:4.[55] He also prepared an affidavit in support of an arrest warrant, attached to which were the statements of Shirley and Zinicola.[56] Lt. Cavanaugh submitted the documents to the Eighth Circuit, District Division Court in Jaffrey, and Judge Runyon of that court issued the arrest warrant.[57] Zinicola turned himself in.[58] A bail commissioner set bail at personal recognizance and included as a condition of bail that the Plaintiff have no contact with Hatch Mott & McDonald or contractors or employees of Kinder Morgan.[59] Trial was scheduled for April 2016.[60]

---

[53] Id. at 27-28

[54] Complaint, doc. 1-1, ¶¶ 23-24.

[55] Doc. no. 37-13.

[56] Doc. no. 37-14.

[57] Doc. no. 37-15.

[58] Id., ¶35.

[59] Doc. no. 37-16.

[60] Doc. no. 37-17.

In December 2015, Zinicola's criminal defense attorney moved for what is known in New Hampshire criminal practice as a "Richards hearing,"[61] claiming that Shirley had given a "conflicting account" about the incident to the Greenville and New Ipswich police, and therefore would be subjected to criminal liability if he were called to testify in Zinicola's criminal trial. Prosecutor Michael Beausoleil disagreed, telling defense counsel that "he did not see a Richards issue, or even dishonesty."[62] Thereafter, Zinicola's lawyer and Beausoleil discussed resolving the case.[63] The charge against Zinicola was subsequently resolved by a "conditional nolle prosequi" on April 26, 2016.[64] The conditional nolle prosequi agreement, signed by the prosecutor and Zinicola's criminal attorney, contains the notation "So ordered" above Judge Runyon's signature, and was

---

[61] Doc. no. 39-17. See State v. Richards, 129 N.H. 669 (1987) (purpose of hearing is to determine whether an individual's "truthful and complete response might be incriminating[.]"); see also, Richard B. McNamara, New Hampshire Practice: Criminal practice and Procedure, 5th ed. § 28.18[4] ("Where a witness called by a defendant declines to testify, claiming the privilege against self-incrimination, the trial court must hold a hearing to consider the question and make a determination as to whether the claim of privilege is well taken.").

[62] Id. at 7-8.

[63] Doc. no. 39-19.

[64] Case summary, doc. no. 39-20; Agreement, doc. no. 46-3. "Nolle Prosequi" translates from Latin as "does not wish to prosecute." Richard B. McNamara, New Hampshire Practice: Criminal practice and Procedure, 5th ed. § 28.18[4]. The entry of a nolle prosequi serves as the functional equivalent of a dismissal; thereafter, the case is no longer pending. State v. Allen, 150 N.H. 290, 292 (2003).

stamped and dated by the Clerk of Court.[65]  Under the terms of

the agreement, Zinicola was required to maintain good behavior

(essentially, commit no crimes) for one year, otherwise the

criminal complaint would be reinstated.[66]

A few months later, Zinicola filed suit in Hillsborough

County Superior Court.  Defendants timely removed the case to

this court.


## III.  Analysis

## A.  Malicious prosecution

In Count 1, Zinicola alleges that Shirley, HMM and Kinder

Morgan tortiously instituted criminal charges against him.

Zinicola's claim for malicious prosecution requires proof that:

"(1) he was subjected to a criminal prosecution or civil

proceeding instituted by the defendant; (2) without probable

cause; (3) with malice; and (4) the prior action terminated in

his favor."  Ojo v. Lorenzo, 164 N.H. 717, 727 (2013).

Zinicola's claim satisfies neither the termination nor probable

cause elements.

---

[65] Agreement, doc. no. 46-3.  At oral argument, plaintiff's
counsel conceded that the lack of Zinicola's signature on the
Agreement has no bearing on the outcome of the pending motions.

[66] Id.

1.  Termination in plaintiff's favor

As previously noted, it is undisputed that Zinicola's prosecution for criminal threatening was terminated with the entry of a conditional nolle prosequi agreement.  The New Hampshire Supreme Court has written extensively on the effect of a nolle prosequi on a subsequent malicious prosecution case, noting that whether a prior nolle prosequi is a "termination in plaintiff's favor" depends on "whether the entry was procured by the plaintiff or was made in consequence of a compromise to which he was a party.  If it was caused in _either_ of these ways, it was not such a termination of the case as will support [a malicious prosecution] action . . . ."  _Lamprey v. H.P. Hood & Sons_, 73 N.H. 384, 385 (1905) (emphasis added) (citing _Woodman v. Prescott_, 66 N.H. 375 (1891)).  The Court later elaborated:

> By the overwhelming weight of authority, where the prior proceeding was ended by a compromise or settlement, voluntarily and understandingly consummated by the accused, there is not such a favorable termination as will support the action. . . . To show a termination in his favor, the plaintiff must prove that the court passed on the merits of the charge or claim against him under such circumstances as to show his innocence or nonliability, or show that the proceedings were terminated or abandoned at the instance of the defendant under circumstances which fairly imply the plaintiff's innocence.  Thus, if the complaint is dismissed either by reason of insufficient evidence or because the complaining witness fails to appear or abandons the prosecution . . . the proceedings have terminated in the plaintiff's favor.  The result is the same if there is a voluntary dismissal by the prosecutor or an entry of a nolle prosequi _when done without the plaintiff's procurement_. . . . Several cases state or imply that _if the accused has consented to or procured the nol. pros._ a cessation of the prosecution will not be such a termination of the

proceedings as will enable him to bring him an action
for malicious prosecution.

Robinson v. Fimbel Door. Co., 113 N.H. 348, 350-51 (1973)

(emphasis added) (internal citations and quotations omitted).

The Court in Robinson ultimately reversed the trial court's

denial of a nonsuit because the evidence "conclusively

established that the nolle prosequi was the result of a

compromise or settlement between the plaintiff and the defendant,

conditioned upon the plaintiff's agreement" to return certain

equipment he was accused of stealing to the defendant.  Id. at

350.  The court concluded that "a plaintiff cannot prevail in a

malicious prosecution action under these circumstances."  Id.

     The same reasoning applies here.  The conditional nolle

prosequi agreement is conditioned upon Zinicola's agreement to

engage in "good behavior" for one year.[67]  There is no indication

that it represents any expression of his "innocence or

nonliability."  Robinson, 113 N.H. at 351.  In addition to the

substance of the agreement, the undisputed record shows that the

agreement was "procured" by the plaintiff, as it was the product

of negotiation between the prosecutor and Zinicola's defense

attorney.[68]  On March 24, 2016, Prosecutor Beausoleil offered a

Conditional Nolle Prosequi based on a condition of two years of

---

[67] Agreement, doc. no. 46-3.

[68] Email thread, doc. no.41-29.

good behavior and no contact with David Shirley.[69]  The same day,
defense counsel replied that a one year condition "would be an
easier sell" to his client, Zinicola.[70]  The next day, defense
counsel said that "Mr. Zinicola accept [sic] the conditional nol
pros" and also indicated his desire to file an annulment of the
arrest.[71]  The final communication from defense counsel in the
record occurred approximately a week later, when he informed the
prosecutor that Zinicola "is expressing reservations about
entering the conditional nolle prosequi agreement."[72]  Defense
counsel signed the agreement on April 26, 2016, the same day it
was signed by the judge and entered on the court docket.[73]

Plaintiff responds with three arguments, all of which are
incorrect factually, legally, or both.  He argues first that
Robinson is not dispositive because the nolle prosequi agreement
entered in his case was not obtained through a compromise, and
second that it contains no conditions because the requirement of
committing no crimes "attaches to any New Hampshire citizen."[74]
At oral argument, he also posited for the first time that
Robinson requires that a conditional nolle prosequi obligate the

---

[69] Doc. no. 41-29, at 5; proposed agreement, doc no. 38-18.

[70] Id. at 4.

[71] Id. at 3.

[72] Id. at 2.

[73] Docket, doc. no. 37-17.

[74] Pltff. Mem., doc. no. 41-1, at 20.

criminal defendant to perform some type of "affirmative act" to be considered a non-favorable termination.[75]  The court addresses these arguments in reverse order.

First, neither Robinson nor any case of which the court is aware requires an "affirmative act."  It is true that in Robinson the criminal defendant was required to return allegedly stolen goods as a condition of the nolle prosequi.  113 N.H. at 349-50. But there is nothing in that case's holding or reasoning that makes such an "affirmative act" a requirement, nor has the plaintiff brought any such cases to the court's attention. Indeed, Robinson relies in part on the seminal New Hampshire case on this issue, Woodman v. Prescott, 66 N.H. 375 (1891), which held, in a matter of first impression in New Hampshire, that "if [plaintiff] has terminated the suit by paying what was demanded, (unless the payment was made under duress) . . . or by compromise, he cannot be admitted to say that the action was commenced without probable cause, and consequently cannot have an action for malicious prosecution."  Id. at 375 (emphasis added). The Court concluded that "if the proceeding has been terminated in the plaintiff's favor, without procurement or compromise on his part, in such a manner that it cannot be revived, it is a

---

[75] The court does not ordinarily consider arguments raised for the first time at oral argument.  See Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, 304 n.19 (D.N.H. 2008). Given the relatively late discovery of the actual nolle prosequi agreement, however, the court will consider plaintiff's newly-raised argument.

sufficient termination to enable him to bring an action for a malicious prosecution." Id. at 377 (emphasis added). The express terms of Zinicola's agreed-to disposition provided that it could be revived, and what circumstances would trigger such revival. Accordingly, the court rejects plaintiff's putative "affirmative act" requirement.

But even if that argument had some merit, Zinicola's conditional nolle prosequi satisfies the requirement, as Zinicola is obligated to perform the "affirmative act" of engaging in good behavior for one year. Contrary to plaintiff's assertion, the "good behavior" condition is more than just a meaningless general requirement attached "to every New Hampshire citizen."[76] While such a citizen could be prosecuted for criminal activity, that citizen, unlike Zinicola, would not face the additional penalty of having a previous case brought forward. Moreover, the fact that the agreement explicitly allows for the criminal case to be reinstated runs afoul of the holding in Woodman that the possibility of revival bars a conclusion that the prosecution terminated favorably. 66 N.H. at 375.

The court also rejects the argument that the agreement was not a product of compromise, as the email exchange between the defense and prosecution is the very embodiment of negotiation and

---

[76] Pltff. Mem., doc. no. 41-1, at 20.

compromise.[77]  At defense counsel's request, the prosecutor

eliminated proposed provisions that would bar Zinicola from

contacting Shirley and reduced the proposed "good behavior"

period from two years to one.  Further evidence of the compromise

can be found in an affidavit from Zinicola's defense attorney,

which notes that Zinicola was reluctant to agree to terms that

required him to stay away from "the alleged victims."[78]  But the

agreement of record does not contain the "stay away" provision

originally proposed, further suggesting that negotiations led to

the final agreement.  There is no dispute that Judge Runyon's

order adopting the conditional nolle prosequi was the final order

resolving his case.  Under applicable law, that was not a

---

[77] Plaintiff suggests that the prosecutor entered into the
agreement because he was concerned that Shirley had "perjured
himself."  Pltff. Mem., doc no. 41-1, at 19; Pltff. Mem., doc.
no. 43-1, at 14.  He cites no record evidence, and to the
contrary, the record evidence suggests the claim is baseless.  At
the beginning of the email exchange between the prosecutor and
Zinicola's defense counsel, the latter provided a copy of his
motion for a Richards hearing, which called Shirley's credibility
into question. Doc. no 41-29, at 8.  Prosecutor Beausoleil
responded with a relatively lengthy disagreement in which he
stated, "I don't see a Richards issue, or even dishonesty."  Id.
at 7.  He also stated his belief that "nothing [Shirley] says
would tend to incriminate him, or even suggest a lack of
truthfulness."  Id. at 8.  It is unfortunately ironic that in a
case where plaintiff is accusing others of making an unfounded
accusation against him - and in which the plaintiff has admitted
conduct (referring to his rifle) that he denied under police
questioning - plaintiff is making an accusation that is both
unsupported and directly contradicted by the undisputed record.

[78] Doc. no. 41-27, ¶ 5.

resolution in plaintiff's favor sufficient to support a malicious prosecution claim.[79]

## 2. Probable cause

Even if there was a genuine issue of material fact as to the termination of Zinicola's criminal case, there is no dispute that the information Shirley and Zinicola provided to the police established probable cause for Zinicola's arrest.

"Probable cause is defined to be such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." MacRae v. Brant, 108 N.H. 177, 180 (1967) (quoting Cohn v. Saidel, 71 N.H. 558, 567 (1902)). The same standard applies to a civilian who provides information to the police that leads to prosecution. See, e.g., id. at 179 (gas station owner); Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 7-8 (1st Cir. 2001) (former employer) (applying New Hampshire law).[80] While the

---

[79] As noted supra, n.66, plaintiff's counsel conceded at oral argument that the absence of Zinicola's signature has no bearing on the analysis. Regardless of that concession, plaintiff has provided no reason why he shouldn't be bound by his attorney's action, especially in light of the negotiations that led up to the executed agreement and the fact that it is signed by the presiding judge and ordered by the court.

[80] Citing the Restatement (Second) of Torts and cases from other jurisdictions, the defendants argue that "merely providing information to the police" does not constitute "initiating proceedings" if the police retain the choice to bring charges. Def. Mem., doc. no 39-1, at 13-16. The New Hampshire Supreme

determination of facts relevant to probable cause is left to a factfinder, the existence of probable cause is ultimately a question of law to be decided by the court. MacRae, 108 N.H. at 180.

Here, the undisputed facts show that Shirley was working on a pipeline project in a rural area that had generated local opposition. Also, that on the day in question, Zinicola, a stranger to Shirley, made a statement that, at a minimum, referenced the possibility of bringing a rifle to, or possessing a rifle at, a place where Shirley encountered the stranger and expected to work again.

Under these circumstances, it is beyond reasonable dispute that Shirley "possess[ed] such knowledge of facts as would lead a man of ordinary caution and prudence to believe," Saidel, 71 N.H. at 567, that he had been threatened.[81] The fact that the prosecutor ultimately decided to resolve the claim through a conditional nolle prosequi agreement does not impact this analysis because a prosecutor's decision to abandon criminal

---

Court has not so held, and several of the cases cited herein involve civilian complaints to police. E.g., Cohn, supra; Martin, supra. Indeed, in Hill v. Miles, 9 N.H. 9 (1837), the Court found that a civilian victim's complaint to a Magistrate could suffice to support a malicious prosecution claim. The court therefore declines to follow defendants' suggested line of cases.

[81] Plaintiff does not suggest that Zinicola fabricated the incident, or that his report to the police should have distinguished between a felony and misdemeanor. See Part III.C.1.a, infra.

charges cannot be used as evidence of lack of probable cause.
See Stock v. Byers, 120 N.H. 844, 847-48 (1980) ("The logic
behind this rule is particularly forceful where someone other
than the defendant enters the nolle prosequi . . . since the
action of that other person has no bearing on the defendant's
state of mind at the time the criminal proceedings were
initiated.").

Finally, "[i]f the defendant had such information as would
reasonably lead him to believe that the accused had committed a
crime, it is immaterial that the defendant may have been actuated
by malice or by motives that were less than noble in bringing the
charge." Id. (citations omitted). Thus, Zinicola's argument
that the defendants' ulterior motives (quelling Zinicola's
pipeline dissent) were driving their decisions about his
prosecution is immaterial.

Plaintiff makes two arguments in support of his claim that
Shirley's accusations did not constitute probable cause. Neither
are persuasive. First, he asserts that because Zinicola's
version of the disputed comment, "Would you be taking this sign
seriously if I were standing here protecting property with my AR
rifle?", (which the court credits as it is more favorable to
plaintiff under Fed. R. Civ. P. 56) was made in the form of a
question, it is not a "true threat."[82] Plaintiff offers no
support for this argument, and it is difficult to take seriously.

---

[82] Pltff. Mem., doc. no. 43-1, at 16.

23

The question, "How would you like a punch in the nose?" is unquestionably threatening, so much in fact, that it is a familiar, cliched way of making a threat. As previously noted, Shirley expected to be working at the same location in the future. The threatening implication that Zinicola might return with a firearm, either immediately or on another work day, does not depend on the punctuation mark at the end of his utterance. Next, Zinicola argues that because Shirley was driving away, even if Zinicola did say, "Wait, I'm coming back with my AR-15," it could not have been taken seriously as a threat because it was unlikely that Shirley would actually wait for Zinicola to return.[83] The court is hard pressed to imagine the comment being construed as a harmless idle threat or, as counsel suggested at oral argument, that it was intended as a joke under the circumstances, especially since Shirley <u>was</u> going to return to the site in the future. At a minimum, the comment could cause "a [person] of ordinary caution and prudence to believe" it was a threat. <u>Saidel</u>, 71 N.H. at 567. As such, the court finds that Shirley did not lack probable cause when he reported Zinicola's conduct to the police.

The undisputed facts of record show that Zinicola's criminal prosecution did not terminate in his favor, and that Shirley did not lack probable cause to report to police the incident that

---

[83] <u>Id.</u>

formed the basis of that prosecutions.  Shirley, HMM and Kinder

Morgan are therefore entitled to summary judgment on Count 1.[84]


B.  Intentional infliction of emotional distress

In Count 3, plaintiff alleges that all defendants except New

Ipswich are liable for intentional infliction of emotional

distress.  The summary judgment record does not provide a basis

for this claim.

Intentional infliction of emotional distress requires proof

that the defendant "by extreme and outrageous conduct,

intentionally or recklessly cause[d] severe emotional distress to

another."  Tessier v. Rockefeller, 162 N.H. 324, 341 (2011)

(quoting Morancy v. Morancy, 134 N.H. 493, 496 (1991)).  To incur

liability for intentional infliction of emotional distress, the

defendant's actions must be "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable

in a civilized community."  Tessier, 162 N.H. at 341 (internal

quotation marks omitted).  "[F]alse accusations may be grounds

for liability under an intentional infliction of emotional

distress claim," particularly when joined with an abuse of

---

[84] The court's findings as to termination and probable cause
inure to the benefit of HMM and Kinder Morgan, as their alleged
liability depends on these factors as well.  Also, given the
court's findings on these issues, the court does not reach the
issue of defendants' alleged malice or whether agency principles
can be used to hold KM responsible for Shirley's actions.

authority.  Mikell v. School Admin. Unit No. 33, 158 N.H. 723,
729 (2009).  The court may, in the first instance, determine
whether factual allegations fail, as a matter of law, to
establish a plaintiff's claim.  Id. at 730-31.

A comparison with the facts in Mikell is instructive.
There, the New Hampshire Supreme Court upheld the trial court's
dismissal of an intentional infliction of emotional distress
claim in a case involving a student who committed suicide.  The
Plaintiff alleged that a schoolteacher falsely reported a
disciplinary infraction against a student, causing emotional
distress that resulted in the student's suicide.  Id. at 729.
The plaintiff claimed that the teacher's motive was to cause the
student's expulsion.  Id.  The Court held that while a "teacher
falsely reporting misconduct by a student is a reprehensible act,
the circumstances of this case are simply not beyond all possible
bounds of decency."  Id. at 730.  Even as alleged by the
plaintiff, nothing about Shirley's conduct could even be
characterized as "reprehensible," a characterization which itself
fell short of the mark in Mikell.

A decision by this court also provides guidance.  In Banks
v. Hall, No. 10-cv-269-JL, 2012 WL 3263607 (D.N.H. Aug. 9, 2012),
the plaintiff sued several state troopers who allegedly kicked,
tasered, and sicced their police dog on him.  Id. at *1.
Although the court found the allegations sufficient to deny the
officers summary judgment on plaintiff's excessive force case,

the court granted summary judgment on plaintiff's emotional distress claim "because, even if the defendants' conduct amounted to excessive force, no rational factfinder could deem it 'atrocious, and utterly intolerable in a civilized society.'" Id. at *2 (quoting Mikell, 158 N.H. at 728).

Here, the allegation against Shirley is that he reported to the police what he believed to be a threat and, that "they" (allegedly Shirley, HMM and KM) "pushed for a felony."[85]  Shirley considering Zinicola's "AR rifle" comment as a threat, and reporting that threat to the police can not be considered as "extreme and outrageous" or "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Moreover, as noted, infra, part III.C.1.a, Zinicola's threat could be seen as felonious.  As such, Shirley, KM and HMM are entitled to summary judgment on Count 3.

## C. 42 U.S.C. § 1983

In Count 4, Zinicola alleges that Lt. Cavanaugh violated his rights under the First and Fourth Amendments to the United States

---

[85] Pltff. Mem., doc. no. 43-1, at 17–18.

Constitution when he was unlawfully arrested.[86]  The undisputed

facts of record warrant summary judgment in the defendant's

favor.


1.  Fourth Amendment

The Fourth Amendment protects the "right of the people to be

secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures . . . ."  U.S. Const. amend.

IV.  It also requires that an arrest warrant be based upon

probable cause, "supported by Oath or affirmation," which may be

satisfied by a police officer's supporting affidavit.  Kalina v.

Fletcher, 522 U.S. 118, 129 (1997).  "A Fourth Amendment

violation may be established if a [plaintiff] can show that

officers acted in reckless disregard, with a 'high degree of

awareness of [the] probable falsity'" of statements made in

support of an arrest warrant.  Burke v. Town of Walpole, 405 F.3d

66, 81 (1st Cir. 2004) (quoting Forest v. Pawtucket Police Dep't,

377 F.3d 52, 58 (1st Cir. 2004) (citation omitted), cert. denied,

543 U.S. 1149 (2005)).  "Similarly, the intentional or reckless

omission of material exculpatory facts from information presented

to a magistrate may also amount to a Fourth Amendment violation."

Id. (citing DeLoach v. Bevers, 922 F.2d 618, 622 (10th Cir. 1990)

---

[86] Complaint, doc. no. 1-1, ¶ 68.  At oral argument, plaintiff
withdrew claims originally asserted against Lt. Cavanaugh under
the Fifth and Fourteenth Amendments and against the Town of New
Ipswich.

(upholding verdict for plaintiff where jury could have inferred
that defendant police detective deliberately or recklessly
excluded the exculpatory opinion of an important medical expert
from the affidavit)).  "Reckless disregard for the truth in the
submission of a warrant application may be established where an
officer 'in fact entertained serious doubts as to the truth of
the allegations' or where 'circumstances evinc[ed] obvious
reasons to doubt the veracity of the allegations' in the
application.  <u>Id.</u> (quoting <u>United States v. Ranney</u>, 298 F.3d 74,
78 (1st Cir. 2002)).  Zinicola alleges that Lt. Cavanaugh failed
both tests by lacking probable cause for a felony charge and by
recklessly omitting material information from his warrant
application.

### a.  Probable cause for a felony charge

     Zinicola first claims that Lt. Cavanaugh lacked probable
cause to charge him with <u>felony</u> criminal threatening, because
that crime requires proof that the defendant "use[d] a deadly
weapon" in the commission of the offense.  N.H. Rev. Stat. Ann. §
631:4, II(a)(2).  In the absence of firearm use, criminal
threatening is a misdemeanor.  <u>Id.</u> § 631:4, II(b).  Because it is
undisputed that Zinicola did not possess a gun at the scene of
the confrontation with Shirley, Zinicola argues that he did not
"use" the rifle within the meaning of the statute and that Lt.

Cavanaugh therefore lacked probable cause for the crime charged. The law does not support this argument.

First, as defendants pointed out at oral argument, there is some authority suggesting that the alleged facts could support the felony count under New Hampshire law. The New Hampshire Supreme Court has let stand a felony criminal threatening conviction where the defendant threatened his ex-girl friend by telephone by referring to the fact that he shot a bullet through her teddy bear (outside of her presence) the day before. <u>See</u> <u>State v. McCabe</u>, 145 N.H. 686 (2001). While not binding, because the "use" question was not at issue in <u>McCabe</u>,[87] the fact that the defendant in <u>McCabe</u> could be convicted of felony criminal threatening when he did not possess or brandish a firearm during the threat is of some significance to the court. Zinicola's reference during the alleged threat to a weapon that he did not physically possess at that moment, but later admitted owning (after denying to police that he mentioned it all) could, in light of <u>McCabe</u>, be a basis for a felony charge.

But regardless of whether Zinicola's threat involved "use of a firearm" within the meaning of the statute, the court's probable cause analysis does not focus on the specific crime charged - here felony or misdemeanor - but upon whether there was

---

[87] The issue before the Court in <u>McCabe</u> was whether the purposeful <u>mens rea</u> required for the material elements of "threatening to commit a crime against a person," under § 631:4, I(d) applied to the penalty enhancement provision of § II(2). 145 N.H. at 692.

probable cause to <u>arrest</u>. <u>See</u> <u>United States v. Jones</u>, 432 F.3d 34, 41 (1st Cir. 2005) (noting that "it is irrelevant that the booking officer cited Jones for 'intent to rob while armed.' If, on the facts known to the arresting officers, there was probable cause to believe he was committing another crime, the arrest was valid."). The court in <u>Jones</u> relied on <u>Devenpeck v. Alford</u>, 543 U.S. 146 (2004), in which the Supreme Court held that an arrest for intent to commit robbery which lacked factual support would nevertheless be upheld because the facts and circumstances known to the arresting officer established probable cause for a firearms violation. <u>Id.</u> at 153. Indeed, the <u>Devenpeck</u> Court observed that the charged crime and the "other" crime did not even have to be "closely related." <u>Id.</u> at 153-54.

While Zinicola acknowledges <u>Devenpeck</u> and its progeny, he argues that it is limited to situations involving only warrantless arrests, as occurred in <u>Devenpeck</u> and <u>Jones</u>.[88] Plaintiff, however, has cited no authority holding that <u>Devenpeck</u> is so limited, and the court is aware of several cases involving arrest warrants that invoked <u>Devenpeck</u> to support a finding of probable cause for a crime other than the one charged. <u>See, e.g.</u>, <u>Hall v. Metro. Gov't of Nashville & Davidson Cty.</u>, No. 3:17-cv-01268, 2018 WL 305751 (E.D. Tenn. Jan. 5, 2018); <u>Pearson v. Lorancaitis et al.</u>, Civ. No. 3:09cv1641(VLB), 2012 WL 162355 (Jan. 19, 2012); <u>Stavis v Reynolds</u>, No. C/A 2:09-2272-DCN-RSC,

---

[88] Pltff. Mem., doc. no. 42-1, at 14.

2010 WL 1294113 (D.S.C. Mar. 5, 2010) (recommendation adopted, 2010 WL 1257344 (Mar. 29, 2010)); <u>Blackwell v. Wenninger</u>, Civ. No. C-1-09-646, 2010 WL 654267 (S.D. Ohio, Feb. 18, 2010); <u>Shelly v. Wilson</u>, Civ. No. 04-02, 2008 WL 5244922 (W.D. Pa. Dec. 15, 2008).

Here, even if Cavanaugh lacked the factual predicate to support a felony charge, there was probable cause nevertheless supporting Zinicola's arrest for criminal threatening.

### b.  Omission of facts

Plaintiff next argues that Lt. Cavanaugh omitted material facts from the warrant application, thus undercutting claim Judge Runyon's finding of probable cause and issuance of the arrest warrant.  <u>See</u> <u>Gerstein v. Pugh</u>, 420 U.S. 103, 113-14 (1975) (observing that "maximum protection of individual rights" is assured when an independent magistrate reviews the factual justification prior to any arrest).

This argument boils down to a claim that Lt. Cavanaugh did not independently investigate the entirety of the case before seeking the arrest warrant and a laundry list of things that Lt. Cavanaugh either should have done or said differently.[89]  But this construct ignores controlling precedent from the First Circuit Court of Appeals, pursuant to which "an officer normally may terminate [his] investigation when [he] accumulates facts

---

[89] <u>Id.</u> at 4-9.

that demonstrate sufficient probable cause." <u>Acosta v. Ames</u>

<u>Dep't Stores</u>, 386 F.3d 5, 11 (1st Cir. 2004).  Moreover, to the

extent that Zinicola argues that Shirley's word alone was

insufficient to establish probable cause, <u>Acosta</u> suggests

otherwise:

> Victims' complaints are a prime source of
> investigatory information for police
> officers. In the absence of circumstances
> that would raise a reasonably prudent
> officer's antennae, there is no requirement
> that the officer corroborate every aspect of
> every complaint with extrinsic information.
> The uncorroborated testimony of a victim or
> other percipient witness, standing alone,
> ordinarily can support a finding of probable
> cause.

<u>Id.</u> at 10.

Here, there is nothing in the record that would support such

"antennae-raising."  Shirley reported the threat by phone shortly

after it happened and then came to the station to meet with Lt.

Cavanaugh. He specifically told Lt. Cavanaugh that the Plaintiff

yelled at him, stating "Wait, I'm coming back with my AR-15."

Shirley also stated that he would be returning to the site the

next day and wanted a police detail for protection.

But Lt. Cavanaugh did not just take Shirley's version at

face value, as he later interviewed Zinicola and provided his

written statement with the warrant application.  Given Zinicola's

response to the AR-15 question - denying making threats, but

admitting to owning the exact rifle that Shirley mentioned

without being told that Shirley mentioned it - Cavanaugh could

have also made a negative assessment of Zinicola's credibility as

to the confrontation with Shirley.[90]  Once those two interviews

were complete, Lt. Cavanaugh had sufficient information to

believe that a crime had been committed.  The probable cause

assessment did not, as Zinicola suggests, require Lt. Cavanaugh

to visit the scene of the dispute, take possession of Shirley's

photograph, ask whether HMM had previously required details,

figure out the precise distance between the two men when words

were exchanged, or whether one or both were in their vehicles at

the time.[91]  See Acosta, 386 F.3d at 11 ("[p]robable cause

determinations are, virtually by definition, preliminary and

tentative.").

Accordingly, the court finds that, as a matter of law, Lt.

Cavanaugh had probable cause to arrest Zinicola.  The Fourth

Amendment claim therefore fails.


2.  First Amendment

Zinicola also claims that Cavanaugh violated his First

Amendment rights in two ways: 1) by arresting him, which,

Zinicola claims, chilled his right to protest the pipeline

project (or anything else); and 2) by playing a role in

establishing the post-arrest bail conditions that he stay at

least 300 feet from where HMM or Kinder Morgan employees are

_____

[90] Zinicola's admission was also significant to Lt. Cavanaugh
because Shirley had no reason to know that Zinicola owned that
particular type of firearm.

[91] Id. at 16-18.

working and have no contact with them.[92] This claim, however, fails for the same reason that undercut his Fourth Amendment claim - the existence of probable cause to arrest him. <u>See</u> <u>Hartman v. Moore</u>, 547 U.S. 250, 265-66 (2006) (holding that a plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause).

Plaintiff cites no authority for his claim that bail conditions can support a stand-alone First Amendment claim separate from a lawful arrest. Regardless, during oral argument, plaintiff's counsel disclaimed any argument that Lt. Cavanaugh was retaliating against Zinicola's exercise of free speech. This concession is fatal to Zinicola's claim that Lt. Cavanaugh's recommendation regarding the "stay-away" condition violated his 1st Amendment rights. "To maintain a claim of retaliation, [Zinicola] must show that the defendant's intent to retaliate against him was a substantial factor in motivating the adverse decision against him." <u>Holder v. Town of Newton</u>, 2010 DNH 212, 17 (citing <u>Collins v. Nuzzo</u>, 244 F.3d 246, 251-52 (1st Cir. 2001)). Given the existence of probable cause and absent evidence of retaliatory motive, Lt. Cavanaugh is entitled to summary judgment on Zinicola's First Amendment claim.[93]

---

[92] Complaint, doc. 1-1, ¶ 37.

[93] Zinicola acknowledges that dismissal of the federal constitutional claims necessitates dismissal of his state constitutional claims. <u>See</u> Pltff. Mem., doc. no. 42-1, at 24-25.

## IV. Conclusion

Defendants' motions for summary judgment[94] are GRANTED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

April 17, 2018

cc: Kurt S. Olson, Esq.
    Peter Malaguti, Esq.
    Douglas N. Steere, Esq.
    Clara E. Lyons, Esq.
    W. Scott O'Connell, Esq.
    Christopher Minue, Esq.
    Brian J. S. Cullen, Esq.

---

[94] Doc. nos. 37-39.